388 A.2d 1071

**COMMONWEALTH of Pennsylvania, Appellee,**

v.

**Charles Henry BREWER, Appellant.**

Supreme Court of Pennsylvania.

Argued March 13, 1978.

Decided July 14, 1978.

Rabe F. Marsh, III, Greensburg, Court-appointed, for appellant.

Albert M. Nichols, Dist. Atty., Patrick H. Mahady, Asst. Dist. Atty., Greensburg, for appellee.

Before EAGEN, C. J., and O'BRIEN, ROBERTS, POMEROY, NIX, MANDERINO and LARSEN, JJ.

## OPINION OF THE COURT

EAGEN, Chief Justice.

This is an appeal from orders of the Court of Common Pleas of Westmoreland County dated September 15, 1976. The case has a unique procedural history.

Charles Henry Brewer was indicted for the murder of his two-year-old stepdaughter, who died on January 19, 1959. On August 31, 1959, Brewer, who was represented by court-appointed counsel, entered a plea of not guilty and trial by jury began on that date. On the third day of trial, after the Commonwealth had presented the testimony of eleven witnesses, Brewer entered a plea of guilty to the charge of murder generally. The guilty plea was accepted on the same day and the jury was discharged. On the following day the court conducted a hearing to determine the degree

of guilt. During this hearing, the Commonwealth introduced a pretrial statement by Brewer and the defense introduced testimony of four witnesses in mitigation of Brewer's conduct. The court found Brewer guilty of murder of the first degree and imposed a sentence of life imprisonment. Brewer was not advised of his right to appeal and no appeal was taken.

After serving more than eleven years in prison, Brewer, represented by the public defender, filed a petition under the Post Conviction Hearing Act, Act of January 25, 1966 P.L. (1965) 1580, § 1 *et seq.*, 19 P.S. § 1180–1 *et seq.* (Supp.1977–78) setting forth six reasons in support of his claim for relief, including the obstruction of his right to appeal. By order of the PCHA court dated November 2, 1970, Brewer was granted the right to appeal from his plea of guilty and the judgment of sentence *nunc pro tunc.* The PCHA court did not address Brewer's remaining complaints.

No appeal was filed; instead on November 6, 1970, the public defender filed a motion to withdraw Brewer's guilty plea and to vacate the sentence. A series of reasons were asserted in support of the motion. On February 26, 1971, the public defender filed an amended motion to vacate the sentence alleging that the Commonwealth did not meet its burden of proof to raise the crime from murder of the second degree to murder of the first degree.

On August 27, 1971, a court en banc dismissed Brewer's motion of February 26, 1971, to vacate sentence ruling there was sufficient evidence to support a conviction of murder of the first degree. The court failed to rule on Brewer's motion to withdraw his guilty plea or to decide the issues raised therein. An appeal was not perfected from this order although Brewer directed his attorney to appeal.[1]

1. The public defender filed a notice of appeal with the prothonotary of the Superior Court and the prothonotary returned the notice of appeal to the public defender. Apparently, the public defender did not file any papers in the Supreme Court. In addition, the files of the prothonotary of the Superior Court contain correspondence from Brewer requesting an extension of time to appeal to which no response was made.

On March 25, 1976, Brewer filed a second PCHA petition. Following a counseled hearing on that petition the PCHA court concluded it had inadvertently overlooked Brewer's motion of November 6, 1970, to withdraw the guilty plea, so it then proceeded to consider and dispose of that motion. Permission to withdraw the guilty plea was denied. At the same time, the court considered the petitions seeking post conviction relief and entered an order denying such relief. This appeal challenges the orders of September 15, 1976, denying the motion to withdraw the guilty plea and denying the request for post conviction relief.

We have concluded the circumstances evidenced by the record dictate that we ignore procedural irregularities and afford Brewer a fair and complete appellate review of the errors he says occurred in the prosecution which resulted in his conviction. Cf. *Douglas v. California*, 372 U.S. 353, 83 S.Ct. 814, 9 L.Ed.2d 811 (1963).

First, Brewer maintains the trial court should have rejected his guilty plea because during the proceedings to determine the degree of guilt, testimony developed which demonstrated he had a complete defense to the charge of homicide. Cf. *Commonwealth v. Roundtree*, 440 Pa. 199, 269 A.2d 709 (1970).

The testimony alluded to is that of a Dr. Altman, called by the defense at the hearing conducted to establish the degree of guilt in an effort to mitigate Brewer's criminal responsibility.

On direct examination Dr. Altman testified in part as follows:

"Q. What could possibly be a diagnosis in an individual such as this?

"A. Psychotic . . .

\* \* \* \* \* \*

I would say he was definitely emotionally immature, he probably has the immaturity of a child in him; he didn't know the difference between right and wrong.

\* \* \* \* \* \*

So there's no question what this man has emotional immaturity, so therefore, you have a person who is not psychotic, a person who is a psychopathic personality, a person who is emotionally immature, who don't [sic] know the difference between right and wrong . . .. and I still don't think he does [sic] the difference between right and wrong, and he never will know possibly . . .."

However, on cross-examination, the doctor qualified his opinion:

"Q. Doctor, you say that he did not know right from wrong; that's the legal test for legal insanity, what an individual knows, right from wrong, and the consequences of his acts; do you mean right from wrong as the average person does or from his own standpoint?

"A. Below normal, low average, his interpretation of right and wrong is entirely different from our interpretation of the average person in this room; we take right and wrong on a very much higher plain than he would take, his interpretation would be a low average, yes.

"Q. Well, then, do you believe that he is legally insane or not?

"A. I do not believe that he is psychotic, and by psychotic I mean legally insane, yes.

"Q. Did he know in your opinion that it was wrong to kill?

"A. Possibly . . . ."

Assuming Dr. Altman's testimony established a viable defense of insanity, the situation presented is ruled by *Commonwealth v. Slavik*, 449 Pa. 424, 297 A.2d 920 (1972). As we held in *Slavik*, where a plea of guilty is unequivocal and accepted on this basis by the court, its validity is not impugned by testimony subsequently given at a degree-of-guilt hearing.

Next, Brewer maintains that his guilty plea was invalid because it was not intelligently, knowingly, and voluntarily entered. It is argued the record does not demonstrate that

he understood the nature of the charges to which he pled guilty and the ramifications of pleading guilty. In other words, the standard for on-the-record guilty plea colloquies enunciated by this Court in *Commonwealth v. Ingram*, 455 Pa. 198, 316 A.2d 77 (1974), was not met.

The record in this case contains the following colloquy conducted by the trial court before accepting Brewer's plea.

"MR. BUCHMAN: If the Court please.

"THE COURT: Mr. Buchman and Mr. Rial, I see you're both up.

"MR. BUCHMAN: Yes, Your Honor; we'd like, after consulting with the defendant, he has instructed his counsel to change his plea to guilty and we ask for the withdrawal of a Juror.

"THE COURT: Do you mean guilty of murder generally?

"MR. BUCHMAN: Guilty of murder generally.

"THE COURT: Have you fully explained what a plea to murder generally means to this defendant?

"MR. BUCHMAN: Yes, we have, Your Honor.

"THE COURT: He fully understands what the consequences might be in the way of a finding by the Court in a plea to murder generally?

"MR. BUCHMAN: We have told him that he will place himself on the mercy of the Court and that he will be entitled to give some evidence in mitigation.

"THE COURT: Oh, yes, he would be entitled to give evidence in mitigation. Do you understand that, Mr. Brewer?

"MR. BREWER: Yes.

"THE COURT: Is that your desire, to enter a plea of guilty to murder generally?

"MR. BREWER: Yes.

"THE COURT: And did you make a motion for the withdrawal of a Juror?

"MR. BUCHMAN: I did, Your Honor.

"THE COURT: In view of all the circumstances the Court will accept a plea of guilty to murder generally and grant your motion for the withdrawal of a Juror."

 The colloquy, while defective by today's standards, must be evaluated by standards in effect in 1959 when the plea was entered.[2] At that time a defendant who was represented by counsel at a guilty-plea hearing was presumed to have entered a knowing and voluntary plea. The burden of proving otherwise rested on the defendant. *Commonwealth v. Alston,* 473 Pa. 40, 373 A.2d 741 (1977); *Commonwealth v. Hubbard,* 462 Pa. 571, 342 A.2d 81 (1977); *Commonwealth ex rel. Crosby v. Rundle,* 415 Pa. 81, 202 A.2d 299 (1964). The standard for determining the validity of a guilty plea entered at that time is that the plea must have been voluntarily, knowingly, and intelligently made by the defendant, with an understanding of the charges against him, of the constitutional rights being waived, and of the consequences of his plea. *Commonwealth v. Alston,* supra.

However, in *Commonwealth ex rel. West v. Myers,* 423 Pa. 1, 222 A.2d 918 (1966), we noted that because the cases had not prescribed a fixed procedure for determining a defendant's understanding of his plea, convictions based on guilty pleas would not be disturbed merely because the court had failed to examine the defendant at the time it accepted his plea. Rather, the defendant's understanding would be treated as a factual issue to be resolved on a case-by-case basis.

 In the instant case Brewer initially pled not guilty to the charge of murdering his stepdaughter. After three days of trial before a jury, when the Commonwealth had substantially completed its case, he entered a plea of guilty. In view of these circumstances, we can assume that Brewer

---

**2.** *Commonwealth v. Minor,* 467 Pa. 230, 356 A.2d 346 (1976) held that *Commonwealth v. Ingram,* 455 Pa. 198, 316 A.2d 77 (1974) announced no new requirements for on-the-record colloquies, but *Minor* does not expressly state when the *Ingram* standard became law in Pennsylvania. Clearly, the *Ingram* standard, which requires that the elements of the crimes charged be explained on the record to a defendant who is about to plead guilty, was not in effect in 1959.

was aware he was presumed to be innocent of the charges against him and that he had a right to a jury trial.

Testimony at the November 2, 1970 PCHA hearing included that of Brewer personally, who stated he decided to plead guilty after hearing his mother and his wife testify against him. Both of his trial counsel testified they recommended the guilty plea because they were convinced that if the issue were left to a jury, Brewer would be found guilty and death in the electric chair would be recommended in the verdict.

The hearing court concluded that Brewer had failed to carry his burden of proving he was not aware of what he did when he pled guilty. We agree. The facts and circumstances surrounding his plea leave no doubt that his guilty plea was voluntary, knowing, and intelligent.

Brewer further maintains that the evidence fails to support the finding of murder of the first degree. We need not reach this question because we are persuaded after studying the record that the trial court in making its adjudication of murder of the first degree improperly considered certain very prejudicial evidence and hence, the adjudication may not stand. This is the situation the record presents in relevant part.

During the trial proceedings before the jury, Brewer's wife was called by the Commonwealth to testify against him. Criminal charges against the wife based on neglect of the child-victim were also pending. An objection by the wife's counsel bottomed on her Fifth Amendment rights was overruled. An objection to Mrs. Brewer testifying by Brewer's counsel was also overruled. Mrs. Brewer was then asked by the district attorney if she had seen her husband strike the victim on the day of the child's death. The response was "no." The district attorney then confronted the witness with a typewritten statement which she acknowledged signing at the instance of the police after questioning. The district attorney informed the court that Mrs. Brewer's answers to questions detailed in the statement

conflicted with her testimony in court and asked permission to cross-examine. The request was granted.[3]

In cross-examination of Mrs. Brewer by the district attorney, the following occurred:

"Q. Did you make the following reply, Mrs. Brewer, listen carefully, 'Before Chuck came home at 1–12:30 [sic] A.M., the baby was playing around the house, and she said she was hungry and I gave her something to eat; she seemed all right before he came home, and when he came home, he put her on the pot and because she would not do her business he hit her three times in the stomach with his fist; she cried for about fifteen minutes, and then he hit her on the arms, head, and on the rear end?'

"A. I didn't say that.

"Q. You did not say that?

"A. I don't remember.

"Q. There's more to that answer, I want you to tell us whether you answered this way or not, 'When he came home, I made up something to eat; he went to bed about 2:00 or 2:30 in the morning; about 4:00 or 4:30 in the morning Agnes got awake and was fussing; Chuck got up and put her on the pot and then she did not go to sleep, and he hit her some more times, I think two or three, and then Chuck and I got up from the bed and I made some coffee and we sat in the kitchen and talked; when it was daylight, Agnes got up, I do not know what time it was as we do not have a clock in the bedroom;' did you say that?

"A. I don't remember saying any of that.

"Q. How about this, in reply to the same question, 'A little while after she got up, she started to vomit; she was on the pot at that time, I mean the first she vomited she was on the pot; she vomited over herself and I put water on to heat to give her a bath, and when I dried her, she started to vomit again while I was holding her in my arm,

3. The trial court's order permitting the Commonwealth to cross-examine its own witness is not challenged, but see *Commonwealth v. Knudsen*, 443 Pa. 412, 278 A.2d 881 (1971).

and I helped her to vomit in the pot a couple times; I put her on the floor and she was just sitting there not doing anything; after I put her on the floor, Chuck picked her up and sat her back against the wall; she started to fall over and then he shoved her head against the wall; I could hear her head hitting the wall, I saw him hitting her head against the wall; I was in the bedroom with him and Agnes was crying at the time he was hitting her head against the wall'; did you say that?

"A. I never said anything of that, I never said that."

The record is unclear as to whether the testimony taken during the trial before the jury was made part of the record of the guilty-plea proceedings. The record is likewise unclear as to whether or not Mrs. Brewer's recorded statement to the police (aside from the references thereto in the district attorney's cross-examination) was made part of the record. For the purposes of this appeal, we will assume an affirmative answer to each question. But the record is crystal clear that the trial court considered the statement of Mrs. Brewer to the police as substantive evidence against her husband.[4] This was error. In view of Mrs. Brewer's failure at the time she testified in court to acknowledge she made the answers credited to her in the pretrial police statement, the statement could be used merely to impeach her trial testimony and not as substantive evidence of guilt against Brewer. See *Commonwealth v. Knudsen*, supra; *Goodis v. Gimbel Bros.*, 420 Pa. 439, 218 A.2d 574 (1966); *Commonwealth v. Bowers*, 182 Pa.Super. 628, 127 A.2d 806 (1956).

[4]. In the opinion of August 27, 1971, overruling the motion to vacate sentence, the court (opinion by the trial judge) said this:
"The above testimony of Doctors Monsour and Crumlish showing the nature and extent of the injuries which had occurred over a long period of time, together with the defendant's admission of having hit the victim with his hands and sometimes with a stick, together with the statement of defendant's wife wherein she described the defendant hitting the victim's head against the wall repeatedly, are more than sufficient to show the requisite malice aforethought for the crime of murder."

The orders and the judgment of sentence are vacated, and the record is remanded to the trial court for reconsideration of the degree of guilt.

NIX and MANDERINO, JJ., concur in the result.